**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**GABRIEL BONILLA**,                          )
                                              )
                    Plaintiff,                )
                                              )
        vs.                                   )        2:09cv712
                                              )        Electronic Filing
                                              )
**MOTEL 6 OPERATING L.P.,**                   )
                                              )
                    Defendant.                )

### OPINION

Gabriel Bonilla ("plaintiff") commenced this negligence action against Motel 6 Operating L.P. ("Motel 6") claiming it breached an applicable duty of care by failing to take reasonable steps to protect its guests from the criminal acts of third parties, and, as a result of that breach, Motel 6 caused plaintiff to suffer serious bodily harm. Presently before the court is defendant's motion for summary judgment. For the reasons set forth below, the motion will be denied.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the

movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although

2

the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below.  On June 14, 2008, plaintiff was slashed with a knife from ear to throat in a Motel 6 parking lot at approximately 1:40 a.m., lost four pints of blood, and received extensive medical care thereafter.   On the night of the injury plaintiff was a guest at a Motel 6 located in Washington, Pennsylvania ("the motel").  Plaintiff and twenty-five of his coworkers were hired to complete a construction project in the area and had been staying at the motel for several weeks because of its proximity to the job site.  Plaintiff was a carpenter on the project and a guest in room 225.   Plaintiff's Deposition (Doc. No. 43-4) at 14.

On June 13, 2008, plaintiff went to work and returned to the motel around 7 p.m.  At some point during that Friday evening he noticed two men, Richard Pruden ("Pruden") and Trey Willis ("Willis"), walking around on the motel sidewalk.  Plaintiff's Deposition at 11.  Pruden and Willis were in room 227 with several women between the ages of 18 and 20.  Willis Deposition (Doc. No. 43-7) at 7.  They had rented a room to "party" for the night and had arrived at the motel sometime between 5 and 6 p.m.  Kowcheck Deposition (Doc. No. 43-8) at 4-5.

 Around 9 p.m., after hours of drinking liquor and smoking large amounts of marijuana, the group in room 227 decided to make a pornographic movie.  Kowcheck Deposition at 4.  While the females were having sex with each other, the group noticed that a large crowd of men had gathered outside their motel room window and were watching their "movie" through the curtains.  Wilson Deposition (Doc. No. 43-10) at 7.   Realizing that a money-making

3

opportunity had presented itself, the women agreed to offer the men sexual services in exchange for money.  Pruden and Willis began setting up the "business transactions" with the men outside.  Young Deposition (Doc. No. 43-11) at 4.  The women took turns having sex with their customers in room 227 while the others waited for their turn outside in a car.  Wilson Deposition at 9; Willis Deposition at 18.  The car was located in the motel parking lot and in front of room 227.  Wilson Deposition at 9.

Around 9:30 p.m., Pruden approached plaintiff and inquired as to whether he was interested in having sex with one of the women for thirty dollars.  Plaintiff's Deposition at 12.  Plaintiff, a native of Honduras, accepted the offer and paid Pruden.  Plaintiff then had sex with one of the women for approximately twenty minutes in room 225.  Plaintiff's Deposition at 12.  At approximately 10 p.m. their session came to an end and plaintiff went to sleep immediately thereafter.  Plaintiff's Deposition at 12.

Plaintiff arose from his slumber around 1:30 a.m., and walked outside of his room to smoke a cigarette.  Plaintiff's Deposition at 11.  He took a few steps toward the sidewalk which was  located only a few feet away from his room and directly in front of the motel parking lot.  Id. at 17.  Plaintiff lit his cigarette and within seconds was confronted by Pruden.  Pruden began instigating a fight, calling plaintiff a "faggot" several times, and asking him if he wanted to fight.  Id. at 17-18; see also Willis Deposition at 10.  Plaintiff offered no response and did not understand why Pruden suddenly took umbrage with him.  Plaintiff's Deposition at 17.  Pruden then punched plaintiff in the face and broke his nose.  Id.

While plaintiff was attempting to defend himself against further attack, he caught sight of Willis exiting the room that Pruden's entourage was occupying.  Plaintiff's Deposition at 17.

4

Upon discovering the brawl, Willis joined Pruden and the two men chased plaintiff into his room where they remained for approximately two minutes before plaintiff came running outside. The chase continued into and around the motel parking lot. Id. at 18.

Plaintiff then saw Willis disappear into room 227 and quickly return with a three and a half inch knife-blade in his hand. Plaintiff's Deposition at 18. At this point blood was dripping from plaintiff's broken nose. He tried to hide between two cars, but the two men wedged him in by standing on each side. Realizing he had no way of escaping, plaintiff threw himself toward the ground in an attempt to avoid contact with the knife. As plaintiff flung himself to the ground, Willis slashed the side of his neck with the knife. Id. at 17. Plaintiff pulled out his cellphone to call the police, but Pruden grabbed the phone from his hand, causing it to break into two pieces. Preliminary Hearing Transcript (Doc. No. 43-5) at 12-13. Willis ran back into room 227 to gather up the women and their belongings and the group quickly fled the scene. Id. at 12. The motel clerk was asked to call for an ambulance and the police arrived soon thereafter. Approximately fifteen minutes passed between the time Pruden delivered the initial punch to the time plaintiff was stabbed. Plaintiff's Deposition at 18.

Defendant's witnesses paint a very different picture. Plaintiff sought to purchase sex much later in the night. After making arrangements with Pruden, plaintiff entered room 227 for that purpose. The door to the room was kept ajar while the transaction was occurring so Pruden and Willis could maintain control. Plaintiff attempted to engage in deviate sexual intercourse and the prostitute resisted and called for help. Pruden and Willis entered the room and warned plaintiff that such conduct was "off the table" and would not be permitted. A short time later plaintiff again attempted to force the prostitute to engage in deviate sexual

intercourse.  Pruden and Willis reentered the room and forcefully terminated the transaction.

Plaintiff became angery, left, began drinking alcohol and thereafter became agitated with and

started to antagonize Pruden.  A fight between Pruden and plaintiff  ensued.  Plaintiff was

slashed after the fight spilled into the parking lot.

Defendant contends it is entitled to summary judgment on the grounds that plaintiff's

participation in the prostitution activity: (1) was an obviously dangerous activity that defendant

had no duty to protect against, (2) caused him to lose his status as a "business invitee,"  (3) was

a substantial factor in producing his injuries and thus bars him from recovery as a matter of

law, and (4) prevented any breach of duty on defendant's part from being the proximate cause

of plaintiff's injury because the attack was "sudden" and "unforeseeable" and any security

measures would not have prevented it.

Plaintiff asserts that at the time of his injury he was not involved in criminal activity

and as a guest of the motel he enjoyed the status of a "business invitee" at all times.  Defendant

had a duty to police its premises because it had sufficient prior knowledge regarding extensive

criminal activity at the motel.  Plaintiff thus contends that defendant's failure to provide

adequate security was a breach of its duty and a substantial factor in causing his injuries.


It is elementary that a plaintiff in a negligence action must establish the following: "(1)

the existence of a duty or obligation recognized by law; (2) a failure on the part of the defendant

to conform to that duty, or  a breach thereof; (3) a causal connection between the defendant's

breach and the resulting injury; and (4) actual loss or damage suffered by the complainant."  T.A.

v. Allen, 669 A.2d 360, 362 (Pa. Super. 1995); see also Morena v. South Hills Health System,

6

462 A.2d 680, 684 fn. 5 (Pa. 1983).   Defendant's contentions primarily raise issues regarding the

elements of duty and causation.

Innkeepers stand in a special relationship with their guests and can owe a duty to take

precautionary measures against potential criminal acts of third parties where through prior

experience or the exercise of reasonable care the innkeeper should reasonably anticipate such

conduct.  The Pennsylvania Supreme Court has adopted § 344 of the Restatement (Second) of

Torts to determine liability for third party criminal acts committed against an invitee on the

business premises.  See Moran v. Valley Forge Drive-In Theater, Inc., 246 A.2d 875, 878 (Pa.

1968) (trial court properly applied § 344 in determining that a possessor of land who holds land

open to patrons for business purposes has a duty to prevent or warn against the possibility of

tortious acts by third parties); see also Donovan v. Strawbridge & Clothier, 1994 WL 1251144,

*5 (Comm. Pl. 1994) ("Restatement (Second) of Torts § 344 and comment (f) have long been the

law of Pennsylvania.").

Section 344 provides:

> A possessor of land who holds it out to the public for entry for his
> business purposes is subject to liability to members of the public while upon the
> land for such a purpose for bodily harm caused to them by the accidental,
> negligent, or intentionally harmful acts of third persons if the possessor by the
> exercise of reasonable care could have (a) discovered that such acts were being
> done or were about to be done, and (b) protected the members of the public by: (i)
> controlling the conduct of the third persons, or (ii) giving a warning adequate to
> enable them to avoid harm.

Restatement (Second) of Torts § 344 (1965); Moran, 246 A.2d at 878.  Moreover, comment (f) to

§ 344 explains:

> (f) Duty to police premises.  Since the possessor is not an insurer of the
> visitor's safety, he is ordinarily under no duty to exercise any care until he knows

7

or has reason to know that the acts of the third person are occurring, or are about to occur. *He may, however, know or have reason to know, from past experience that there is a likelihood of conduct on the part of the third persons in general which is likely to endanger the safety of the visitor, even though he had no reason to expect it on the part of any particular individual.* If the place or character of his business, or his past experience is such that he should reasonably anticipate a careless or criminal conduct on the part of a third person, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a *reasonably sufficient number of servants to afford a reasonable protection.*

Restatement (Second) of Torts § 344 cm. f. (emphasis added). Thus, to establish liability under § 344, a plaintiff must satisfy three elements: "(1) that plaintiff was injured by the kind of acts described in the section; (2) that such acts were being done, or were likely to be done; and (3) that the defendant failed in one of two duties - either to take reasonable care to discover that such acts were being done or were likely to be done, or to take reasonable care to provide appropriate precautions." Moultrey v. The Great A & P Tea Co., 422 A.2d 593, 598 (Pa. Super. 1980).

Section 344 requires that "reasonable measures be taken to control the conduct of third persons, or to give adequate warning to enable patrons to avoid possible harm." Moran, 246 A.2d at 879. A jury question is created where the evidence demonstrates that the defendant "had notice, either actual or constructive, of prior acts committed by a third person within their premises, which might cause injuries to patrons." Ross v. Sunoco Inc., 56 Pa. D. & C. 4th 358, 364 (Com. Pl. 2002)(citing Moran, 246 A.2d 875). It also is the function of the jury to determine whether "adequate measures were taken to control the conduct of third persons." Id.; see also Bloom v. Dubois Regional Medical Center, 597 A.2d 671, 680-81 (Pa. 1991)("[W]hether an act or failure to act constitutes negligence, of any degree . . . has always been particularly committed

to determination by a jury.").

The issue of whether a defendant breached any duty may be removed from the jury only "when the case is free from doubt and there is no possibility that a reasonable jury could find negligence." Emerich v. Philadelphia Center for Human Development, Inc., 720 A.2d 1032, 1044 (Pa. 1998); see also Bloom, 597 A.2d at 681 (same).   As the Pennsylvania Supreme Court explained:

> The reason is clear; places to which the general public are invited might indeed anticipate, either from common experience or known fact, that places of general public resort are also places where what men can do, they might.  One who invites all may reasonably expect that all might not behave, and bears responsibility for injury that follows the absence of reasonable precaution against that common expectation.

Feld v. Merriam, 485 A.2d 742, 745 (Pa. 1984).

The record demonstrates that plaintiff has adduced sufficient evidence to create genuine issues of material fact with respect to whether through prior experience and/or the exercise of reasonable care defendant owed plaintiff a duty to protect against criminal conduct on its premises by other business invitees or third parties and breached that duty by failing to take precautionary measures.

Contrary to defendant's contentions, the record can lead a reasonable juror to conclude that defendant indeed had reason to anticipate that criminal conduct was likely to occur on its property and pose a danger to its patrons in general.  Between January 19, 2002 and June 14, 2008, the South Strabane Township Police had over 447 "Calls for Service" ("CFS") to the motel.  Expert Report of R. Paul McCauley, Ph.D., FACFE (Doc. No. 39-1) at 9.  Of these, 142 of the incidents reflect "violent/potentially violent incidents."  Supplemental Expert Report of

R. Paul McCauley, Ph.D., FACFE (Doc. No. 40-1) at 5.  Of the 142 "violent/potentially violent incidents," roughly "62 or 43% of them occurred between 10:00 p.m. and 6:00 a.m." Id. Although incidents occurred over the entire week, of the 62 incidents that occurred between 10:00 p.m. and 6:00 a.m., 39 of them took place on Fridays and Saturdays. Id.  The CFS report indicates that there were 11 calls during the first 13 days of June 2008 alone, not counting the entry associated with plaintiff's assault.  CFS Report (Doc. No. 39-4) at 40.

The CFS reports, however, do not accurately reflect salient information like whether entries that have a corresponding room number mean that the incident(s) occurred in the room and/or whether entries without a room number mean that the incident(s) occurred outside in the common areas.  Supplemental Expert Report of R. Paul McCauley, Ph.D., FACFE, at 2. Likewise, the true nature of the incidents reported cannot be ascertained because this information is not accurately reflected in the CFS reports.  Expert Report of R. Paul McCauley, Ph.D., FACFE, at 9.  By way of example, although plaintiff's slashing  occurred outside in the parking lot, the incident report listed "Room 229" as the place of occurrence.   CFS Report at 40.  Furthermore, the description only  notes an "Assault-Knife or Cutting Instrument" and does not reference the crime of prostitution because incident reports only reflect the initial request made in the incoming call.  See Testimony of Officer Bruner (Doc. No. 43-13) at 9. Most times the true nature of the incident that prompted the call is not discovered until the police arrive.  To illustrate this point one officer testified that a prostitution call "would most likely come in as a suspicious circumstance or a disturbance and then when you get up there and you talk then you find out through the worker that, hey, you didn't hear it from me, but I think there's a couple ladies working Room 410 or a bunch of guys are going into 408."

Testimony of Officer John Bruner at 9.

Despite the uncertainty in the CFS reports regarding the true number and nature of crimes that occurred on defendant's property, the evidence as viewed in the light most favorable to plaintiff will support a jury finding that defendant had reason to anticipate the occurrence of criminal activity on its premises. The motel was considered a "problem area" in the eyes of local law enforcement. Testimony of Officer John Bruner at 40. "[T]he patrol culture of South Strabane Township is that Motel 6 is a high crime area compared to the other areas [in] South Strabane Township." Id. The motel's general manager was concerned that the motel was becoming a nuisance due to the frequency that the local police were called for service. Testimony of Officer Zofchak (Doc. No. 43-16) at 5. Notwithstanding such concern and despite knowledge of its reputation for being a crime hot spot, defendant: (1) did not employ security personnel, (2) did not have surveillance cameras capable of monitoring the common areas or parking lot, (3) relied on local police patrols to provide the bulk of its security, and (4) charged its employees, who are untrained in security matters, with the duty of being the "eyes and ears" of the motel. Expert Report of R. Paul McCauley, Ph.D., FACFE, at 4-5.

The motel is a four building complex with 105 rooms. Id. at 11. Despite its size, defendant only has one manually adjustable surveillance camera. The camera can only be adjusted to provide surveillance within the lobby area. It consistently is kept focused on the desk and cash register. Id. at 4. Defendant has no cameras to monitor guest activity that occurs elsewhere, such as outside of the rooms, the common areas, the parking lot, and so forth. In other words, it only provides surveillance where its cash register is located. The only other

monitoring of the property is provided by the general manager when he occasionally walks his dog around the premises at night.  Testimony of Officer Torboli (Doc. No. 43-12) at 4.  Although defendant relies heavily on routine patrols to provide almost all of its security, the patrols last only 3-4 minutes and only take place every couple of hours.  Supplemental Expert Report of R. Paul McCauley, Ph.D., FACFE, at 4.

Furthermore, the record reflects that the local police directly communicated concerns over defendant's rental policies to defendant.  Officers met with one of defendant's representatives to address various security concerns.  Testimony of Officer Bruner at 3.  They advised defendant on what measures it could take to increase the effectiveness of its security.  Id.  One of the biggest points of concern for the South Strabane Township police was the fact that defendant frequently rents rooms to local residents.  Renting to locals was viewed as problematic because "[a]lot of those arrests and things . . . were locally known people to us."  Testimony of Officer Zofchak at 5-6.  One officer testified:

> we had concerns with the rental policies that Motel 6 used, because we felt, and I felt also, *that it was bringing people - - - undesirables in there*, and it was our thought that by not renting locally or them giving rooms to the locals, some of those locals, that we could eliminate some of the problems there.

Id. at 5-6 (emphasis added).

Moreover, what could be viewed as most disconcerting is that Willis, the individual who slashed plaintiff, was one such local who previously had rented a room just weeks before the incident.  Willis Deposition (Doc. No. 43-7) at 24.  During his previous stay the front desk clerk suspected that he was engaging in criminal activity and warned him that "they" were "watching him."  Id. at 23.  On the night of the incident, there is evidence that the same front

12

desk clerk recognized him and rented a room to the woman he was with despite having personal knowledge that Willis had previously been suspected of engaging in criminal activity on the premises.  Id. at 23-24.  Recognition notwithstanding, there is no evidence that any special attention was given to monitoring Willis's activity to ensure that he was not engaging in similar suspicious activity.

The record also reflects that both the motel's reputation and security culture were well known to local residents and the jury might well conclude that this reputation and culture contributed to, if not promoted, the use of the motel for criminal activities by locals.  Due to the absence of on-site security personnel and/or surveillance cameras that monitored activity outside the rooms, the jury could infer that defendant's security policies were susceptible to being easily manipulated by "street smart" criminals such as Willis.  For example, when asked if anyone from the motel ever came to room 227 on the night in question to determine whether any suspicious activity was occurring, Willis responded:

> To the best of my knowledge, they will only do that if they receive a report.  And from my experience with Motel 6, I believe, if they get a report, they're coming. So I think we was [sic] pretty much on top of that.

Willis Deposition  at 23.  He further testified:

> . . . I think everybody will tell you this that has any experience with Motel 6 . . . Motel 6, if they receive any report whatsoever . . . they're going to make a phone call and then within two or three minutes of that phone call the police will be at your door.

Id.  When asked about the basis of his knowledge regarding the motel's security protocol, he responded:

> Like I said, I have people that I won't even name that are in prison to this day because they did exactly what I was telling you that Motel 6 looks for, and *they*

13

*did it in a manner that was obvious . . . .*

Id. at 23 (emphasis added). In order to prevent a call to the police on June 13, 2008, Willis admitted that unlike the individuals to which he made reference, he was being extremely cautious and was "monitoring and attempting to patrol and keep at a minimum the people that were leaving and exiting the room and the people that were outside of the room." Id. at 23. In response to questioning about what he did when the police conducted a routine patrol on the property that night, he stated: "[I] just continued to go about what I was doing. If they would ride past, I wouldn't dip off and run and make myself look suspicious . . . I did not change my actions." Id. at 22.

Willis' testimony reflects a strong degree of sophistication and understanding about how to conceal suspicious behavior from defendant. The jury may well infer that defendant's security policies, including its heavy reliance on local police, permitted "street smart" criminals like Willis, who understood how to operate under this 3-4 minute patrol window, to avoid detection of their criminal activities during the short time frame when police were on the premises. It also may infer that defendant's reputation in the area and lack of continuous monitoring made it entirely foreseeable that the motel would continue to attract a criminal element on its premises.

The record clearly demonstrates defendant's awareness of its potential to attract illicit activity through its rental policies, its security deficiencies and its understanding of the risks associated with not having trained security personnel on site. Consequently, a reasonable juror could conclude that defendant was supplied with more than sufficient notice that it was attracting clientele that posed a danger to its other guests given (1) the frequency with which

14

the local police were called for assistance, (2) its inability to monitor guest activity

continuously, (3) the fact that police had directly communicated concerns over the type of

clientele defendant was attracting and offered suggestions on how to counter the problem of

increased criminal activity, and (4) the fact that the motel's manager knew about the motel's

reputation, knew that it was considered to be a high crime location, and had a concern about it

being a public nuisance.  It further follows that there is ample evidence from which a

reasonable juror can conclude that defendant, through its prior experiences, had more than

sufficient notice that criminal activity was likely to occur on its premises.

   Even assuming for the sake of argument, however, that the above evidence were to be

insufficient to establish prior notice of criminal activity, genuine issues of material fact remain

as to whether defendant exercised reasonable care to discover that criminal conduct was

occurring or about to occur on its premises on the night of June 13, 2008.  Despite defendant's

assertion that the attack was "sudden", the evidence in the light most favorable to plaintiff

establishes that (1) for hours there was heavy foot traffic around room 227 where the

prostitution was taking place, (2) there was close to twenty men gathered outside of room 227

and on the motel sidewalk peering into windows at one point, (3) thereafter there was a loud

dispute regarding payment with other unrelated customers that took place outside on the motel

sidewalk and lasted for about 10 minutes, (4) for at least an hour there were girls waiting in a

car in a parking lot, listening to music, and taking turns entering room 227, and (5) later that

same night approximately 15 minutes passed from the time plaintiff was punched in the nose,

until the time of the slashing.

   Moreover, the "primary security technique to detect prostitution is by patrol/visual

observation of solicitation and recurring pedestrian traffic in/out of certain guest rooms."
Expert Report of R. Paul McCauley, Ph.D., FACFE, at 7.  Contrary to defendant's assertion
that "the only security measure that even arguably could have prevented the attack would have
been the fortuitous presence of a security guard stationed at the exact location of the attack,"
the fact that there was a large number of people walking in, out and around room 227 as well
as the fact that most if not all of the solicitations took place outside could well lead a
reasonable juror to conclude that the presence of a security guard or attendant occasionally
passing through the parking lot and/or surveillance cameras that were capable of monitoring
the parking lot and common areas continuously would have prevented the activity from
occurring or at the very least would have led to the discovery of the suspicious activity and the
undertaking of appropriate measures in response thereto.  Indeed, the fact that the assault on
plaintiff lasted nearly 15 minutes is in itself sufficient to support a finding that additional
security may well have provided adequate notice of the altercation and an opportunity to
intervene.  At the very least, a jury could conclude that minimal measures could have
prevented the attack from escalating to the point where plaintiff came within minutes of losing
his life.

As the above makes clear, the record as read in the light most favorable to plaintiff
contains ample evidence from which a reasonable juror could find that that based on either its
prior experience or the exercise of reasonable care defendant did have reason to anticipate the
likelihood that criminal activity would occur on its premises in general and/or that it was
occurring or about to occur on the night of June 13, 2008.  In other words, defendant did owe
plaintiff a duty to take reasonable precautions against harm from the criminal acts of other

16

guests and/or third parties accompanying the guests. Assuming the jury finds the facts sufficient to provide a basis for defendant to anticipate such conduct, issues of fact likewise exist as to whether defendant breached the duty to provide reasonable measures to safeguard against such conduct.

Against this backdrop, defendant's assertion that paying for sex is an "obviously dangerous activity" and therefore it owed no duty to plaintiff is unavailing. Defendant contends that "procuring sex through pimps is an illegal and obviously dangerous activity" and that it is under no duty "to protect guests from the consequences of their own acts." Def. Brief in Support of Summary Judgment (Doc. No. 44) at 11. Defendant essentially raises a "no duty" argument grounded in the theory of assumption of risk.

In Pennsylvania, "a possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." Restatement (Second) of Torts §343A. The Pennsylvania Supreme Court has ruled that an assumption of risk analysis is simply a counterpart to a duty analysis. See Carrender v. Fitterer, 469 A.2d 120, 124 (Pa. 1983) (assumption of the risk operates merely as a corollary of the absence of a duty). As the Carrender Court aptly explained:

> Appellee misperceives the relationship between the assumption-of-risk doctrine and the rule that a possessor of land is not liable to his invitees for obvious dangers. When an invitee enters business premises, discovers dangerous conditions which are both obvious and avoidable, and nevertheless proceeds voluntarily to encounter them, the doctrine of assumption of risk operates merely as a counterpart to the possessor's lack of duty to protect the invitee from those risks. By voluntarily proceeding to encounter a known or obvious danger, the invitee is deemed to have agreed to accept the risk and to undertake to look out for himself. It is precisely because the invitee assumes the risk of injury from

17

obvious and avoidable dangers that the possessor owes the invitee no duty to take measures to alleviate those dangers. *Thus, to say that the invitee assumed the risk of injury from a known and avoidable danger is simply another way of expressing the lack of any duty on the part of the possessor to protect the invitee against such dangers.*

Carrender, 469 A.2d at 125 (emphasis added); see also Montagazzi v. Crisci, 994 A.2d 626, 635 (Pa. Super. 2010) (a finding that plaintiff knowingly and voluntarily encountered an obvious and dangerous risk relieves those "who may have otherwise had a duty" to protect against the danger because the plaintiff "implicitly agree[d] to take care of himself").  In other words, a determination that a plaintiff assumed the risk is "in effect . . . [a] determin[ation] that the plaintiff relieved the defendant of the duty to guard him from a risk of harm regardless of the source from which the duty derived."  Montagazzi, 994 A.2d at 636.

"A danger is deemed to be 'obvious' when 'both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising normal perception, intelligence, and judgment.'"  Carrender, 469 A.2d at 123-24 (quoting Restatement Second of Torts § 343A, comment b).  For a danger to be "known," it must "not only be known to exist, but ... *also be recognized that it is dangerous* and the probability and gravity of the threatened harm must be appreciated."  Id. at 124 (emphasis added).  Thus,  the assumption of risk doctrine requires that the risk be "perceived" subjectively and "faced voluntarily."  Barrett v. Fredavid Builders, Inc., 685 A.2d 129, 131 (Pa. Super. 1996).

Typically, a determination as a matter of law  that "the plaintiff has assumed the risk of his injuries such that recovery is prevented should occur only where it is *beyond question* that the plaintiff voluntarily and knowingly proceeded in the face of an obvious and dangerous condition."  Barrett, 685 A.2d at 131 (emphasis added); accord Montagazzi, 994 A.2d at 636

18

(The court may decide the issue "only where the evidence reveals a scenario so clear as to void all questions of material fact concerning the plaintiff's own conduct.").   And the courts have not hesitated to make such determinations where there is no question that the dangers surrounding the activities or conditions were "unchanging, obvious, and known by the plaintiffs." See e.g. Malinder v. Jenkins Elevator & Mach Co., 539 A.2d 509, 514 (Pa. Super. 1988) (assumption of risk barred recovery where the plaintiff stuck his head in an elevator shaft and testified that he was aware of risk of getting struck by the elevator); Carrender, 469 A.2d at 120 (the plaintiff assumed risk of injury from falling on ice where location of ice in parking lot was "known and obvious" to the plaintiff and she "nevertheless chose to encounter its slippery condition"), Howell, 620 A.2d at 1107 (trial court did not err in determining as a matter of law that the plaintiff assumed risk of injury from igniting homemade cannon that shot fireworks) and Banks v. Trustees of the University of Pennsylvania, 666 A.2d 329, 332 (Pa. Super. 1995) (trial court did not err in finding that the defendant owed no duty to the plaintiff because the "danger associated with jumping from a four-foot wall was both obvious and known to the appellant" as evidenced by the appellant's own deposition testimony). Conversely, such determinations also are proper where the evidentiary record will not support the application of the doctrine.  See Martin v. Recker, 552 A.2d 668, 674 (Pa. Super. 1988) (assumption of risk defense unavailable where the record unequivocally demonstrated that "the dangerous condition of the ramp . . . was not obvious and known to [the plaintiff]")

The importance of establishing the plaintiff's subjective awareness of any particular risk prior to determining whether assumption of risk will relieve the defendant of a corresponding duty has been highlighted by two Pennsylvania Supreme Court cases.  In

19

Carrender, the plaintiff injured herself when she slipped and fell on a sheet of ice that was located on the landowner's parking lot.  469 A.2d at 121.  The trial court refused to charge the jury on the defense of assumption of risk and the Superior court affirmed.  Id. at 122-23.   In holding that the trial court erred, the Carrender Court determined as a matter of law that the plaintiff assumed the risk of injury from walking on the ice because "[a]ppellee's own testimony showed not only that the existence of the ice was obvious to a reasonably attentive invitee, but also that *appellee herself was aware of the ice and appreciated the risk of traversing it*."  Id. at 124 (emphasis added).

Similarly, in Howell v. Clyde, the trial court determined as a matter of law that plaintiff assumed the risk of injury when he ignited a homemade fireworks cannon.  620 A.2d 1107, 1108 (Pa. 1993).  The Superior Court reversed and remanded for a new trial.  The Supreme Court reversed the Superior Court and held that the trial court did not err in concluding that the plaintiff had assumed the risk of injury.  Because the plaintiff subjectively was aware that "the ignition of gunpowder is inherently dangerous and might cause injury to himself or others" and nevertheless proceeded in the face of that danger, it was not error for the lower court to determine that the defendant owed no duty as a matter of law.  Id. at 1113.

An inextricable component in both Howell and Carrender was that there was "no question" that the injured party knew of the risk and voluntarily proceeded in the face of it.  In other words, the evidence in each case clearly established that the plaintiffs understood and appreciated the particular danger associated with the activity they were undertaking and chose to face that danger notwithstanding the risk it presented.  Significantly, the Howell court recognized that "one of the problems in an assumption of risk analysis is determining what the

plaintiff subjectively knew and whether the plaintiff's course of action was voluntarily and deliberately taken." Id. at 1110. Because it was "beyond question" that the plaintiff in Howell perceived the risk created by igniting large amounts of gun powder and knowingly proceeded to encounter that risk, the court was able to determine that no duty was owed as a matter of law.

Unlike Carrender and Howell, the record indicates that this is not a case where the evidence demonstrates or even suggests that the plaintiff subjectively perceived a danger or risk associated with paying for sex. In his deposition plaintiff testified that prostitution is legal and "normal" in his native country. He testified that he did not know it was illegal in the United States and Pennsylvania. Plaintiff's Deposition (Doc. No. 43-4) at 15. He also testified that he was unaware of some of the potential danger surrounding prostitution until the incident at the motel because in Honduras prostitution is "normal" and regulated by the government. Id. ("In my country that's normal. There are zones where they sell women freely and you can get a license for that."). Importantly, plaintiff testified that he had never dealt with "pimps" prior to June 13, 2008, and that he was unaware of the danger that a "pimp" could present. Id. at 15-16. Plaintiff also indicated that he did not feel endangered at any point before or during the "business transaction." Id. at 16. When asked whether he felt endangered when he was "discussing the payment and making the payment with [Pruden]," plaintiff responded "[n]o, he just came to offer her to me and I paid him and that was it." Id.

Plaintiff's understanding and perception of prostitution and its consequences are relevant to the issue of whether he subjectively perceived any danger or risk associated with paying for sex. Accepting plaintiff's statements as true, the evidence indicates that plaintiff

21

was not subjectively aware of any risks in his decision to pay Pruden $30.00 to have sex

because the same behavior was legal and considered "normal" in Honduras.  See Hardy v.

Southland Corp., 645 A.2d 839, 839-40 (Pa. Super. 1994) (under prevailing Pennsylvania law

the plaintiff must at the very least actually perceive and appreciate the risk and then voluntarily

proceed to encounter it before assumption of the risk doctrine will relieve a defendant from a

corresponding duty governing its conduct).  Furthermore, if the evidence shows only that

plaintiff did not perceive paying for sex to be dangerous, then his choice to proceed with the

activity cannot be said to have been an acceptance of the risk of any potential danger that it

encompassed.  See Martin v. Recker, 552 A.2d 668, 674 (Pa. Super. 1988) ("Since Martin did

not perceive that the ramp placement was dangerous, his decision to walk up the ramp that

evening was not an acceptance of the risk of its potential danger."); see also Seewagen v.

Vanderkluet, 488 A.2d 21, 25 (Pa. Super. 1985) (declining to find that the plaintiff assumed the

risk where despite his testimony "that he saw the rusty condition, he did not admit that he knew

of the potential danger").  Thus, even assuming  paying for sex constitutes an "obviously

dangerous activity," the relevant inquiry is whether the danger surrounding the activity was

known to plaintiff, and the evidence only supports the proposition that it was not.

　　　Moreover, the pertinent inquiry is whether getting slashed by a three and a half inch

blade is a specific risk that is inherent in paying for sex.  The theory of assumption of risk

contemplates "[p]reliminary and deliberate conduct done with an *awareness of the specific*

*risks* inherent in the activity"  Fish v. Gosnell, 463 A.2d 1042, 1049 (Pa. Super. 1983)

(emphasis added).  As one court explained:

　　　　　Ice always is slippery, and a person walking on ice always runs the risk of

slipping and falling.  The plaintiff in <u>Carrender</u> admittedly saw the ice prior to stepping on it.  Similarly, fireworks always explode, and a person always encounters a risk of injury from that explosion when he uses fireworks.  Thus, the plaintiff in <u>Howell</u> knew the risk.

<u>Barrett</u>, 685 A.2d at 131.

Here, the fact that the illicit business transaction would prove to be dangerous in the form of a violent attack did not come to be known until three and one-half hours after the transaction was over.  Plaintiff's testimony is devoid of any basis to assume or infer that he subjectively appreciated any such risk.  Furthermore, defendant has presented no evidence that violent, assaultive attacks regularly and persistently accompany routine episodes of prostitution and the court is unaware of any sound evidentiary basis that supports such an assessment.[1] Consequently, the record is devoid of any evidence to support the proposition that plaintiff knowingly assumed the risk of getting slashed or violently assaulted by paying for sex and therefore summary judgment cannot be granted on this basis.

Defendant's argument that plaintiff lost his status as a business invitee when he paid for sex also is unavailing.  Specifically, defendant asserts that plaintiff "lost his status as an invitee when he purchased sex through Pruden and Willis, and became a trespasser or, at best, a licensee."  Def. Brief in Support of Motion for Summary Judgment (Doc. No. 44) at 13.

The duty that a possessor of land owes to an entrant is determined by the status held by the entrant at the time of injury.  <u>Emge v. Hagosky</u>, 712 A.2d 315, 318 (Pa. Super. 1998) (the

---

[1]While there is some evidence from defendant's own security records that fighting and disturbances of the peace periodically erupted at the motel and at times such conduct appears to have been associated with prostitution, these facts cannot support a determination that plaintiff was engaged in an obviously dangerous activity and/or that he "fully realized the [specific] risks involved or manifested a willingness to accept them or waived his right to later complain of defendant's negligence."  <u>Seewagen v. Vanderkluet</u>, 488 A.2d 21, 25 (Pa. Super. 1985).

evidence "support[s] a conclusion that [the] Appellant was a business invitee when the accident occurred."); see also Crotty v. Reading Industries, Inc., 345 A.2d 259, 262 (Pa. Super. 1975) (duty towards entrant "has been historically measured by the status of the entrant at the time of the accident").  The standard of care owed to an entrant varies depending on whether his status was that of a trespasser, licensee, or business invitee.  Trude v. Martin, 660 A.2d 626, 630 (Pa. Super. 1995) (the applicable standard of care depends on the plaintiff's status on the land).

A business invitee is "a person who is invited to enter or remain on the land of another for a purpose directly or indirectly connected with business dealings with the possessor of land." Restatement (Second) of Torts § 332; see also Emge, 712 A.3d at 317 (same).  A possessor of land is under an "affirmative duty to protect the business visitor not only against dangers of which he knows but also against those which with reasonable care he might discover." Crotty, 345 A.2d at 263.  This standard of care is "the highest duty owed to any entrant upon land" and charges the occupier of the premises with the "duty to use reasonable care to discover unreasonably dangerous conditions of the premises and either put the premises in a reasonably safe condition for use in a manner consistent with the purpose of the invitation or warn him of the danger." Id.

A licensee is "a person who is privileged to enter or remain on land only by virtue of the possessor's consent."  Restatement (Second) of Torts § 330.  A landowner is liable for harm caused to a licensee when: "(a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger," and "(b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved," and "(c)

24

the licensees do not know or have reason to know of the condition and the risk involved." Restatement (Second) of Torts § 342; see also Sharp v. Luksa, 269 A.2d 659, 660 (Pa. 1970) (adopting Restatement (Second) of Torts § 342 as Pennsylvania law).

In contrast, a trespasser is defined as "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise."  Restatement (Second) of Torts § 329.  A trespasser is only afforded protection from willful or wanton misconduct on the part of a landowner.  Dudley v. USX Corp., 606 A.2d 916, 921-22 (Pa. Super. 1992).

The scope of a business invitee's invitation "may be limited as to space, time, and method of user of the premises."  Hanson v. Lehigh Valley R. Co., 120 F.2d 498, 499 (3d Cir. 1941).  A business invitee enjoys his status so long as "he keeps within the limit of his invitation."  Id.  So long as the invitee is making "what can reasonably be contemplated as an ordinary and reasonable use of the premises . . . for the purposes for which he has been invited" he will not be said to have exceeded the scope of his invitation.  Id.  The invitee, however, is "not invited to use any part of the premises for purposes which he knows are wrongfully dangerous and constitute an improper use."  Id.   If an invitee does not use the premises in the manner "contemplated by the terms, express or implied, of the invitation," then he is stripped of the "protection to which he is entitled as an invitee."  Id.  Thus, where one initially enters upon the land as a business invitee, he may lose his status and become a trespasser if he exceeds the scope of his invitation.  See id.; see  also Emge, 712 A.2d at 317 ("one may enter the premises as a business visitor but may during the stay become a trespasser if they enter upon a portion of the premises where their presence is not reasonably foreseen.").

25

The determination of whether a plaintiff enjoyed the status of a business invitee or trespasser at any particular moment in time is one of fact for the jury. <u>Palange v. City of Philadelphia</u>, 640 A.2d 1305, 1307 (Pa. Super. 1994) (holding that the trial court properly submitted the issue of a land entrant's status to the jury). Similarly, the issue of whether a plaintiff exceeded the scope of his invitation is one that also requires resolution by the jury. <u>Emge v. Hagosky</u>, 712 A.2d 315, 318 (Pa. Super. 1998) (holding that the trial court improperly removed the question of whether plaintiff was a "trespasser" or "business invitee" from the jury). A court may decide the issue of status as a matter of law only where the facts are undisputed and the evidence is insufficient to support a contrary finding. <u>See</u> <u>Palange</u>, 640 A.2d at 1307 (a court may remove the question of status only where "the evidence is insufficient to support an issue").

The record contains conflicting evidence and numerous discrepancies in the accounts of what the witnesses say happened. In the light most favorable to plaintiff, the prostitution transaction had been over for nearly four hours at the time of injury. Under these circumstances a reasonable juror could find that he never lost or lost and then resumed his status as a "business invitee." In short, the evidence is such that reasonable minds could differ as to plaintiff's status at the time of attack and therefore summary judgment cannot be granted based on this issue.

Plaintiff also has adduced sufficient evidence to create genuine issues of material fact as to whether any breach on the part of defendant was the cause of his injuries. In order to establish the element of causation, a plaintiff must prove that the breach was "both the proximate and actual cause of the injury." <u>Lux</u>, 887 A.2d at 1287. Proximate cause is defined

as "a wrongful act which was a substantial factor in bringing about the plaintiff's harm." Dudley, 606 A.2d at 923.  Actual causation refers to "cause in fact" or "but for" causation, which provides that "if the harmful result would not have come about but for the negligent conduct then there is a direct causal connection between the negligence and the injury."  First v. Zem Zem Temple, 686 A.2d 18, 21 (Pa. Super. 1996)

Proximate and actual causation are "separate and distinct concepts."  First, 686 A.2d at 21.  Proximate causation, or legal causation, is a determination that "the injury sustained is of such a nature that it is socially and economically desirable to hold the wrongdoer liable."  Id. This aspect of proximate cause is a legal question that must be established before the issue of actual causation can be submitted to the jury.  Reilly v. Tiergarten Inc., 633 A.2d 208, 210 (Pa. Super. 1993) (trial court's failure to make legal determination of proximate cause before sending case to jury constituted error).  Making this threshold determination is crucial because "[e]ven where harm to a particular plaintiff may be reasonably foreseeable from the defendant's conduct, and that conduct is the cause-in fact of the plaintiff's harm, the law makes a determination that, at some point along the causal chain, liability will be limited."  Alumni Ass'n, Delta Zeta Zeta of Lambda Chi Alpha Fraternity v. Sullivan, 535 A.2d 1095, 1098 (1987) (At a certain point in the causal chain of events "negligent conduct will be viewed as too remote from the harm arising to the plaintiff, and thus not a substantial factor in bringing about the plaintiff's harm.").

An analysis of proximate cause essentially is two-fold.  First, the court determines whether "the alleged negligence was so remote that as a matter of law, the defendant cannot be held legally responsible for the subsequent harm."  Holt, 932 A.2d at 921.  This requires an

assessment of whether "the injury would have been foreseen by an ordinary person as the natural and probable outcome of the act [in question]." Id. Only when "it appears to the court highly extraordinary that the actor's conduct should have brought about the harm" will the actor's conduct be determined not to be a legal cause of that harm. Id.

Second, if the alleged negligence was not "so remote" and the injury "would have been foreseen by an ordinary person as the natural and probable outcome" of the negligent act, the issue is submitted to the jury, which then determines whether the negligent act was a but-for cause of the harm  and a "substantial factor" in producing the harm. See Rabutino v. Freedom State Realty Co., Inc., 809 A.2d 933, 941 (Pa. Super. 2002) ("Whether a defendant's conduct [was] a 'substantial factor' in causing plaintiff's harm is ordinarily a question of fact for the jury."); see also Novak v. Jeannette Dist. Memorial Hosp., 600 A.2d 616, 618 (the determination of whether a negligent act constitutes the cause-in-fact is an issue for the fact-finder).

Plaintiff has adduced sufficient evidence to establish proximate cause.  Defendant's contention that it was not the proximate cause of plaintiff's injury due to the "unforeseeable" and "sudden" nature of the attack is wide of the mark.  Defendant claims that it "had no reason to anticipate such an attack" and that "the only security measure that even arguably could have prevented the attack would have been the fortuitous presence of a security guard stationed at the exact location of the attack."  Def. Brief in Support of Summary Judgment (Doc. No. 44) at 18.  Defendant's assertions overlook the significant fact that in the ultimate analysis of whether it failed to take reasonable steps to protect its guests against criminal conduct by other guests or third parties present through their invitation, the issue of whether defendant could have

anticipated harm to any particular person is irrelevant if the evidence will support a finding that defendant knew or should have known from past experience that harmful third party conduct was likely to occur on its property.  See Moran v. Valley Forge Drive-In Theater, Inc., 246 A.2d 875, 878 (1968) ("[A possessor of land] may, however, know or have reason to know, from past experience that there is a likelihood of conduct on the part of the third persons in general which is likely to endanger the safety of the visitor, even though he had no reason to expect it on the part of any particular individual." ).

    In light of the above, there is nothing "highly extraordinary" about a guest getting slashed with a knife in an unmonitored, unguarded parking lot, located in a high crime area at 1:30 a.m. on a Saturday morning following an altercation between guests that lasted several minutes.  Nor is there anything "highly extraordinary" about criminal activity occurring on defendant's property given the motel's prior experience and ongoing lax security culture.   Any negligence on the part of defendant would not be "so remote" as to be unforeseeable and indeed, plaintiff's "injury [c]ould have been foreseen by an ordinary person as the natural and probable outcome of" given defendant's prior experiences and failure to provide virtually any additional security measures on its premises.  Holt, 932 A.2d at 921.

    Plaintiff also has adduced sufficient evidence to create genuine issues of material fact as to whether defendant's alleged negligence was a "substantial factor" in bringing about his injuries.  Defendant's contention that plaintiff's participation in prostitution activity bars him from recovery as a matter of law is not without force.  The facts of this case have the potential to find themselves within the purview of the common law principle that "a person will not be

29

permitted to profit by his own wrong, particularly by his own crime."[2]  Giacobetti v. Insurance Placement Facility of Pennsylvania, 457 A.2d 853, 857 (Pa. 1983).  Nevertheless, plaintiff would be precluded from recovering for the losses that flowed from his participation in the prostitution only upon a finding that such activity was a substantial factor in producing his injury.  See Alexander v. Synthatron Corp., 1991 WL 341741 * 3-4 (Pa. Com. Pl. 1991)("[I]f plaintiff's criminal activities on the night [of the incident] were a substantial factor in causing his injuries, the need to deliberate further as to the liability of [the] defendants was unnecessary" because "[we] do not believe that the law should permit these plaintiffs to recover in circumstances where the [] plaintiff's criminality was a substantial factor in causing plaintiff's injury.").  As previously noted, such a determination is not within the province of the court as it would require weighing conflicting evidence and assessing the credibility of witnesses - functions that are reserved for the fact-finder.  See Noyes v. Cooper, 579 A.2d 407, 410 (Pa. Super. 1990) (trial court "improperly weighed the conflicting evidence and disregarded the testimony of the plaintiff, an improper usurpation of the function of the jury."); see also Snead v. Society for Prevention of Cruelty to Animals of Pennsylvania, 929 A.2d 1169, 1176 (Pa. Super. 2007) ("The weighing of [conflicting evidence] involved credibility determinations which were for the jury.").  Thus, the determination of whether plaintiff's admitted participation in prostitution was a substantial factor in producing his injuries generally is beyond the function of the court at this juncture.

---

[2] 18 Pa.C.S.A. § 5902(e) makes it illegal to patronize a prostitute.  It provides:
A person commits the offense of patronizing prostitutes if that person hires a prostitute or any other person to engage in sexual activity with him or her or if that person enters or remains in a house of prostitution for the purpose of engaging in sexual activity.

Moreover, despite defendant's assertion that the attack occurred immediately after plaintiff purchased and had sex, the record as read in the light most favorable to plaintiff would support a jury finding that his involvement in any prostitution activity was not a substantial factor in causing the harm because (1) the attack was sufficiently attenuated from the prostitution activity and/or (2) alternative reasons for the assault existed that were unrelated to the prostitution activity.

First, genuine issues of material fact exist as to whether plaintiff went to sleep before the altercation ensued.  The record is replete with conflicting testimony as to this issue.  Specifically, a material issue exists as to whether plaintiff went to sleep or, as defendant contends, the attack occurred very shortly after plaintiff's prostitution transaction was terminated.  Plaintiff testified that he had sex in his room around 9:30 p.m. and went to sleep by himself around 10:00 p.m.  Plaintiff's Deposition (Doc. No. 43-4 ) at 13.  He was asleep for three and one-half hours, woke up and walked outside for a cigarette.  Id.  It is undisputed that the attack did not occur until around 1:30 a.m.  Plaintiff's testimony that he went to sleep  must be accepted as true.  As such, the three and one-half hour time lapse between the "business transaction" and the subsequent attack would support a jury finding that the prostitution was not a substantial factor because the assault sufficiently was attenuated from it.

Second, there is evidence from which a reasonable juror could conclude that motives unrelated to the prostitution activity prompted the attack.  There is testimony that the group in room 227 arrived at the motel between five and six p.m. and had been drinking and smoking "mad weed" for several hours thereafter.  See Wilson Deposition (Doc. No. 43-10) at 6; see also Kowcheck Deposition (Doc. No. 43-8) at 4-5.  Given the uncontested fact that the assault

31

did not happen until 1:30 a.m., a reasonable juror could conclude that Pruden and Willis

enjoyed a five-to-six hour window of "partying" before the altercation ensued.  Five to six

hours of drinking liquor and smoking marijuana obviously is enough time for alcohol and

drugs to affect one's judgment, inhibitions, and behavior.  A reasonable juror could conclude

that Pruden was intoxicated and this caused him to take offense with the way plaintiff was

allegedly "looking at him," conclusions that are buttressed by Willis' uncontroverted testimony

that Pruden called plaintiff a "faggot" before punching him in the face.  Willis Deposition

(Doc. No. 43-7) at 10.  The evidence taken in the light most favorable to plaintiff will support a

finding that Pruden's aggressive and confrontational behavior toward the plaintiff was caused

by the excessive amounts of liquor and drugs he consumed and this was the stimulus

underlying the attack. Such a finding then would permit a reasonable juror to conclude that

plaintiff's activities earlier in the night were not a substantial factor in producing his injuries.

Additionally, given plaintiff's testimony regarding the time lapse between the

prostitution and the assault, a reasonable inference can be drawn that if plaintiff had not

decided to smoke a cigarette outside upon waking in the middle of the night, there would not

have been any altercation between plaintiff and Pruden.  Plaintiff testified that he paid Pruden

before the transaction, dispelling the notion that the attack somehow was predicated on

plaintiff's failure to pay for the sex.  Plaintiff's Deposition (43-4) at 13.  Such an inference also

suggests that the reasons underlying the attack were unrelated to the prostitution, because if the

impetus for the attack was related to the sex plaintiff had with one of the women, a reasonable

juror could conclude that Pruden would not have allowed plaintiff to retire to his room and

sleep for several hours before Pruden dealt with the situation.  Any of these explanations would

suffice to establish a motive for the assault that does not implicate plaintiff's activity earlier in the night.  Given the discrepancies surrounding the timeline of events, reasonable minds clearly can differ on whether plaintiff's role in the prostitution activity was a substantial factor in bringing about his injuries, thus rendering a determination as a matter of law on this issue improper.

In sum, the record contains sufficient evidence to support a finding that defendant had adequate notice that it was attracting clientele that posed a danger to other guests.  Id.  The motel chose to ignore police recommendations and failed to implement new security measures such as addition security personnel or extra surveillance.  Such nonfeasance  not only could be found to have served to reinforce the motel's reputation for being a lax security atmosphere, but also could be viewed as indifference to its guests' safety and a desire to continue such practices for monetary gain.  Under such circumstances it cannot be said that the possibility that one of the motel's guests would suffer serious injury at the hands of another guest or third party was beyond the realm of foreseeability.  Consequently, the ultimate question of whether any negligence on defendant's part was a substantial factor in causing plaintiff's injuries rests with the jury.

Genuine issue of material fact exists as to whether defendant breached a duty to protect plaintiff against criminal acts that might occur on its premises.  A reasonable juror could conclude that plaintiff was injured by a criminal act committed by another third party/guest, that such an act could reasonably be anticipated and that defendant failed to take reasonable steps to provide adequate safety measures or precautions.  A reasonable juror could also conclude that plaintiff enjoyed the status of a business invitee at the time of the injury and defendant's failure

33

to implement additional safety measures or precautions was a substantial factor in bringing about plaintiff's injuries.   Accordingly, defendant's motion for summary judgment must be denied.

Date: September 15, 2011

                                        s/David Stewart Cercone
                                        David Stewart Cercone
                                        United States District Judge

cc:     C. E. Kurowski, Esquire
        E. J. Julian, Esquire
        Edward A. Greenberg, Esquire
        Paul D. Lux, Esquire
        Tory Ford Taylor, Esquire

        (Via CM/ECF Electronic Filing)